IN THE COMMONWEALTH COURT OF PENNSYLVANIA

BNE Real Estate Group           :
                  Appellant     :
                             :
          v.             :    No. 443 C.D. 2025
                             :    Argued:  April 13, 2026
City of Easton Zoning Hearing Board, :
City of Easton, Alphonse Bellafatto,  :
Ann Bellafatto, Ralph Bellafatto, Lois :
Bellafatto, Ruediger Gebhardt, Paula  :
Gebhardt, Carol Devlin, Charles Dzuba, :
Carla Garfield, Allen Jones, Michael   :
Nees, Caroline Lee, Vincent Gangemi,  :
Regina Gangemi, Brett Weber, Van     :
French, and Michael Gable         :

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
                HONORABLE MATTHEW S. WOLF, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
PRESIDENT JUDGE COHN JUBELIRER        FILED:  July 13, 2026

      BNE Real Estate Group (BNE) appeals from the Order of the Court of Common Pleas of Northampton County (trial court) dated February 28, 2025 (Order), affirming the decision of the Zoning Hearing Board (ZHB) of the City of Easton (City), which denied BNE's application for a special exception (Application) to build a low-rise residential apartment complex.  Upon careful review, we reverse

because the ZHB erred by misinterpreting the Easton Zoning Code (Zoning Code),[1] misapplying the applicable burdens, and concluding that the Objectors met their heavy burden of proving, with a high degree of probability, that the proposed use threatens the health, safety, and welfare of the community.

## I. BACKGROUND

This appeal concerns the proposed development of a low-rise residential apartment complex by BNE, consisting of 16 two-story apartment buildings that would contain a total of 256 apartment units. (ZHB Decision,[2] Findings of Fact (FOF) ¶¶ 8(a), (c).) BNE holds an equitable interest in 300 Morrison Avenue (Property), a 45.4-acre parcel located in both Forks Township and the City. (*Id.* ¶ 1, 9(b); Reproduced Record (R.R.) at 51a, 59a.) The 38.9 acres on which BNE proposes to develop the apartments are in the City, within the College Hill Zoning District. (R.R. at 59a; FOF ¶¶ 5, 8(c).)

Residential low-rise complexes are permitted as a special exception in the College Hill Zoning District, under Section 595-12(C)(2) of the Zoning Code, subject to compliance with requirements set forth in Sections 595-32(A)(3) and 595-40(C) of the Zoning Code. (FOF ¶ 5.) Following submission of the Application, BNE presented the proposed development at a public hearing before the Easton Planning Commission (Commission). By resolution dated March 6, 2024, the Commission voted to recommend that the ZHB deny the proposed special exception.[3] (*Id.* ¶ 6; R.R. at 52a.)

---

[1] CITY OF EASTON, NORTHAMPTON CNTY., PA., ZONING CODE §§ 595-01–595-41 (2020), *as amended*. The Zoning Code is in the Original Record as Item 19 and is also available at https://ecode360.com/9647638 (last visited July 13, 2026).

[2] The ZHB's Decision is found at pages 6a to 15a of the Reproduced Record.

[3] While Nicholas Buckner testified for BNE that City staff at the Commission recommended approval of the proposed special exception and the Reproduced Record contains a

The ZHB held a public hearing on the Application on March 18, 2024.[4] (R.R. at 50a.) In support of the Application, BNE presented Mark Bahnick, John Wichner, and Nicholas Buckner as witnesses. Bahnick, the project engineer, presented the site plan to the ZHB, which depicts proposed construction of 16 two-story buildings, each containing 16 "garden apartments," with a pool and clubhouse. (R.R. at 59a-61a; FOF ¶¶ 2, 8(c).) Bahnick testified that the proposed development would have two points of access from George Street, one through the existing access street, Morrison Avenue, and the other in the area of the existing pathway cut into George Street to the North of Morrison Avenue.[5] (R.R. at 60a-61a; FOF ¶ 8(d).). Bahnick testified that the proposed development would not have streets, instead having access drives to parking areas. (R.R. at 63a.) Bahnick described the Property as surrounded by a school campus, another multi-family development, single-family homes, a historic two-story apartment complex, open space, and a YMCA. (*Id.* at 66a-67a; FOF ¶ 8(g).) Bahnick testified regarding the specific requirements set forth in Section 595-32(A)(3) of the Zoning Code and concluded that BNE satisfied each of these specific criteria for special exception approval. (R.R. at 67a-72a; FOF ¶ 8(h).) Bahnick further opined that BNE's proposed development satisfied all general requirements under Section 595-40(C) of the Zoning Code. (R.R. at 72a-82a; FOF ¶ 8(i).) BNE introduced various plans of the project, all of which were admitted. (FOF ¶ 7.)

---

draft resolution to that effect, the ZHB noted that final resolution from the Commission recommended denial. (R.R. at 49a, 52a, 135a.)

[4] The transcript for the hearing before the ZHB is found at pages 50a to 193a of the Reproduced Record.

[5] A map of the proposed development is found at page 46a of the Reproduced Record. Additional plans and aerial views are found in the Original Record at Item 18 (Exhibits O-1 to O-3, A-1.1 to A-1.4, A-2 to A-4.)

On cross-examination, Bahnick testified that portions of the Property are difficult to build upon due to steep slopes, that the portion located in Forks Township is not being developed as it is not zoned for residential use, and that the proposed density for building is concentrated in "one spot." (R.R. at 85a-87a, 90a; FOF ¶ 9.) Bahnick testified that "one-hundred percent of the ingress/egress to this 256-dwelling-unit proposed complex is coming out to the east in these [] two locations[, Morrison Avenue and a stub road]." (R.R. at 92a-93a; FOF ¶ 9.)

John Wichner testified as a private transportation consultant and traffic engineer retained by BNE to review the project. (R.R. at 97a-110a; FOF ¶ 11.) Wichner testified that he referenced the "Institute of Transportation Engineers Trips Generation Manual" (ITE Manual) to estimate the number of trips to be generated from the use proposed by BNE. (R.R. at 101a-02a; FOF ¶ 11(b).) Relying on the data presented in the ITE Manual applicable to low-rise, multi-family housing, Wichner concluded that the use proposed by BNE will not cause congestion beyond that which is usually associated with the proposed use. (R.R. at 104a; FOF ¶ 11(c).) Wichner testified that a traffic impact study during the land development stage of the project could address how specific conditions at the Property might affect his conclusions. (R.R. at 105a-06a, 112a-17a.)

Buckner, director of land acquisition for BNE, testified that the proposed development is for an "A8" use,[6] with apartment-type, multi-family, two-story maximum structures. (*Id.* at 134a-37a; FOF ¶ 13.)

---

[6] "A8" use, known as "A8 Residential Low-Rise" use, is defined as follows: "One or more multifamily structures, containing a maximum of two stories, and including related amenities (*e.g.*, common open space), and each dwelling unit is occupied by a single housekeeping unit. Garden apartment type development shall be included in this definition." ZONING CODE § 595-09(A)(1)(h).

Owners and residents of properties along the neighboring 200 block of Morrison Avenue appeared at the hearing to oppose the Application. (FOF ¶ 14.) These neighbors included Ralph Bellafatto, Bellafatto's parents, Rudy and Paula Gebhardt, and Derrick and Susan Baker.[7] (R.R. at 83a-84a.) Before the ZHB, Mr. Bellafatto, an attorney, represented these neighboring property owners/residents, along with himself. (R.R. at 84a; FOF ¶ 14.)

Bellafatto addressed the ZHB in his dual role as counsel and an interested party.[8] Bellafatto presented the ZHB with a site map and two Google image aerial photographs that depicted both the Property and the intersection of Morrison Avenue and George Street (the intersection), which were admitted without objection. (R.R.

_____

[7] On appeal, Bellafatto also represents Lois Bellafatto, Carol Devlin, Charles Dzuba, Carla Garfield, Allen Jones, Michael Nees, Caroline Lee, Vincent and Regina Gangemi, Brett Weber, Van French, and Michael Gable, but not the Bakers (collectively, Objectors).

[8] It is not clear whether Bellafatto was sworn in by the stenographer. At the start of the hearing, the ZHB asked that all "clients" stand up to be sworn in and stated that those not sworn in would not be permitted to testify:

> THE CHAIRMAN: All right, counsel, I see your clients are here. But I'm going to ask them to be sworn now. Anybody that's here for this hearing that wants to speak, if you're not sworn in right now, you're not going to speak. So if you, if you want to speak tonight, you've got to stand up and be sworn in.
>
> . . . .
>
> (All concerned were duly sworn.)

(R.R. at 52a.) We cannot discern from this transcript whether Bellafatto stood to be sworn at the start of the hearing, but we note that he is not included among the individuals that the ZHB found in its Decision to have been sworn in at the hearing's commencement. (FOF ¶ 2.) Later in the hearing, the ZHB's Solicitor invited Bellafatto to "make a statement that would be representative of what most of the people feel." (R.R. at 138a.) Bellafatto then recounted his personal experience with the intersection and the streets surrounding the Property, in a manner resembling testimony. (*Id.* at 138a-54a.) We note, however, that neither the ZHB nor any counsel asked Bellafatto whether he had been sworn before speaking, as was done for several other witnesses who were sworn again before their testimony. Bellafatto was also not subject to cross-examination.

5

at 143a-44a; Original Record (O.R.) Item 18, Ex. O-2 to O-3; FOF ¶ 14.) Bellafatto described the intersection of George Street and Morrison Avenue as "blind on three sides," with low visibility on both George Street and Morrison Avenue due to the roads crossing over a hill. (R.R. at 145a; FOF ¶ 14.) Bellafatto advised that the intersection is well-trafficked as a popular shortcut route. (R.R. at 145a-46a; FOF ¶ 14.) Bellafatto stated that the proposed development would essentially be a dead-end "massive cul-de-sac" that empties all traffic to the single location of the intersection, which he also identified as the location of a children's bus stop. (R.R. at 149a-51a; FOF ¶ 14.) Bellafatto spoke to a history of accidents at the intersection, four of which caused damage to his father's property. (R.R. at 150a; FOF ¶ 14.) Bellafatto based these statements on his experience growing up and living in the vicinity of the intersection since approximately 1972. (R.R. at 84a, 139a-40a, 143a; FOF ¶ 14.)

Peter Terry, a professional engineer and president of an engineering company, testified as the Objectors' traffic engineering expert. (R.R. at 157a-62a; FOF ¶ 16(a).) Terry testified to concerns regarding access to the Property, given the "very dangerous" four-way intersection where Morrison Avenue and George Street cross, at the access point of the proposed development. (R.R. at 159a-60a; FOF ¶ 16(b).) Terry testified that the intersection has inadequate sight distance and an unusual number of stop signs (three rather the typical four for a four-way intersection), causing him to question capacity and safety at this intersection, particularly in bad weather. (R.R. at 159a-61a; FOF ¶ 16(b).) Terry opined that certain improvements could be made at the intersection to improve safety but that the unique topography limits the amount of possible improvements. (R.R. at 167a-68a; FOF ¶ 16(b).) Terry concluded that the traffic impact of the proposed use on the surrounding area would

be greater than that of a development with multiple access points. (R.R. at 161a-62a.)

Rudy Gebhardt[9] testified to concerns regarding traffic safety, the dangers of the intersection, and alterations to the character of the neighborhood if the proposed use is approved. (*Id.* at 168a-72a; FOF ¶ 17.) Gebhardt testified to drivers traveling through the intersection at high speeds and his concern that "[s]omebody's going to die" at the intersection due to these speeds and low visibility. (R.R. at 169a-70a.) Gebhardt testified that both he and the Bellafattos would be unable to safely back out of their driveways on Morrison Avenue due to traffic that he anticipates the addition of the proposed 256 apartment units and related parking would generate. (*Id.* at 170a-71a; FOF ¶ 17.)

A representative of a neighboring business and a City council member appeared to oppose the Application. (R.R. at 154a-57a, 172a-73a; FOF ¶¶ 15, 18.) Two residents of Chestnut Ridge also opposed the Application and voiced concerns regarding traffic safety and alterations to the character of the neighborhood (collectively, with the neighboring business and council member, nonparty neighbors). (R.R. at 173a-76a; FOF ¶¶ 19-20.) At the close of testimony, the ZHB asked whether BNE would consider requesting a continuance to obtain a traffic study, given the ZHB's concerns about the traffic impact of the proposed development. (R.R. at 189a-90a.) BNE declined the ZHB's offer. (*Id.* at 192a.)

On April 19, 2024, the ZHB issued a decision by unanimous vote, denying the Application. (*Id.* at 6a-14a.) Based upon the above findings, the ZHB concluded

---

[9] Although the official caption lists the name "Rudy Gebhardt" with the same spelling as that reflected in Bellafatto's notice of intervention in the Original Record (O.R. Item 7), we note that Rudy Gebhardt testified that he spells his last name as "Gebhard." (R.R. at 168a.) For consistency's sake, we have adopted the spelling from the official caption.

that BNE did not meet the requirements of Sections 595-32(A)(3) and 595-40(C) of the Zoning Code for granting a special exception. (ZHB Decision at 6-8.) With respect to Section 595-32(A)(3), the ZHB concluded that while BNE "technically" complies with the dimensional requirements for minimum lot size, it "did not necessarily comply with the spirit of the [Zoning Code]" because:

> the calculations presented to reach that number included the overwhelming majority of the property that is not developable, but rather, [the ZHB] sided with the witness presented on behalf of the objectors, noting that, in this instance, [BNE has] "crammed" all of the units into the small portion of the [P]roperty that is developable, which does not leave enough room to create public streets that would assist in accommodating, for example, school bus stops which would at least keep all of the traffic generated by and within the development from having to congregate on and negotiate George Street with all necessary bus stops having to be placed there too[.]

(*Id.* at 7.)

The ZHB likewise concluded that BNE technically complied with maximum impervious surface and maximum dwelling units per acre requirements, but did not comply "with the spirit" of the Zoning Code because its calculations did not reflect that the majority of the Property was not planned for development. (*Id.*) The ZHB concluded that BNE complied with Section 595-32(A)(3)(d) and (f), relating to maximum building length and proximity of buildings to one another, respectively. (*Id.*) As to subsection (e), the ZHB concluded that BNE complied with this subsection "relative to the fa[ç]ades of the structure." (*Id.*)

Turning to the general requirements in Section 595-40(C) of the Zoning Code, the ZHB concluded that BNE failed to establish compliance with subsections (1), (4), (6) and (9), related to overcrowding, changes to the character of the surrounding residential neighborhood, traffic congestion, and negative impacts of the proposed

use as related to the Property's location and neighboring lands, respectively. (*Id.* at 7-8.) The ZHB concluded BNE complied with the "literal requirements" of subsection (8) related to suitability for the site but "not necessarily its intent." (*Id.* at 8.) As to the remaining subsections under Section 595-40(C), the ZHB concluded that BNE complied. (*Id.* at 7-8.)

BNE timely appealed the ZHB's Decision to the trial court on May 15, 2024, and the City and Objectors intervened. (O.R. Items 1, 5, 7.) Without taking any additional evidence and relying on largely the same analysis of the ZHB, the trial court determined that the ZHB properly denied the Application because the proposed development did not comply with subsections (1), (4), (6) and (9) of Section 595-40(C) of the Zoning Code. (R.R. at 18a-33a.) Accordingly, the trial court held that the ZHB did not err or abuse its discretion, and, therefore, affirmed. BNE now appeals to this Court.[10]

## II. PARTIES' ARGUMENTS

BNE raises two issues on appeal: (1) whether it presented substantial evidence demonstrating compliance with all special exception use requirements specific to low-rise apartment use; and (2) whether the Objectors to the Application failed to show that the proposed use would generate traffic in excess of what would normally be generated by the same type of use, i.e., by low-rise residential developments, and that this abnormally high traffic would threaten the health and

---

[10] "Where the trial court does not take additional evidence, we are limited to determining whether the zoning hearing board committed an error of law or manifestly abused its discretion." *Coal Gas Recovery, L.P., v. Franklin Twp. Zoning Hearing Bd.*, 944 A.2d 832, 837-38 (Pa. Cmwlth. 2008) (citation omitted). "An abuse of discretion occurs when the findings are not supported by substantial evidence in the record." *Id*. at 838 n.9 (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

safety of the community. (BNE's Brief (Br.) at 9, 13, 15.) BNE argues that it had the initial burden of demonstrating compliance with the specific requirements applicable to low-rise apartments, set forth in Section 595-32(A)(3) of the Zoning Code, that it met each of these requirements, and that the burden then shifted to the Objectors to rebut the presumption that the proposed use is consistent with public health, safety, and general welfare. (*Id.* at 13-14.) BNE asserts that it presented substantial evidence demonstrating that the proposed use would not generate traffic congestion beyond what would normally be expected for the proposed use and that neither the Objectors nor any nonparty neighbors opposed to the project produced any evidence "beyond mere lay expressions of concern for increased traffic" or which demonstrated that such abnormal traffic would pose a "substantial threat to [] health and safety[.]" (*Id.* at 15-17.)

The ZHB responds that it did not commit an error of law, abuse its discretion, or make findings of fact not supported by the record in denying the Application. (ZHB's Br. at 6.) The ZHB argues that regardless of whether it referenced the "spirit" or intent of the Zoning Code in its analysis of Section 595-32(A)(3), the record supports the conclusion that BNE failed to establish compliance with the objective requirements of this Section. (*Id.* at 9-12.) Specifically, the ZHB argues that the record supports the conclusion that the proposed development does not contain streets; therefore, BNE cannot prove compliance with Section 595-32(A)(3)(e)'s requirement that "the primary façade of the residential low-rise buildings shall front **the street** upon which it is constructed" and, for corner lots, "have primary façades **on each street** the building is situated." *See* ZONING CODE § 595-32(A)(3)(e) (emphasis added). The ZHB argues that even if BNE complied with Section 595-32(A)(3), BNE must comply with all general requirements of

10

Section 595-40(C) and failed to do so here. (ZHB's Br. at 26.) The ZHB contends that BNE's expert witnesses, Bahnick and Wichner, presented significant credibility concerns and failed to consider specifics of the Property and the present characteristics of neighboring lands, all of which contributed to safety and congestion concerns beyond what would normally be anticipated for the same use. (*Id.* at 13-21.)

The City responds that BNE failed to meet the special exception criteria set forth in Section 595-40(C) of the Zoning Code, specifically the criteria for "congestion in public streets or transportation systems" and for "negative impacts" of the proposed use, the latter of which takes into consideration the characteristics of the Property and neighboring lands. *See* ZONING CODE § 595-40(C)(6), (9). The City argues that once testimony and evidence concerning characteristics of neighboring lands established congestion beyond what would normally be generated for such use and adverse impacts on health, safety, and welfare, the burden shifted back to BNE. (City's Br. at 9-10.) The City argues that BNE's "trip" data was insufficient to demonstrate compliance with the Zoning Code, and that if all that was required was to prove that a similar development would generate the same number of trips, this would remove the Commission's ability to consider unique circumstances of neighboring lands. (*Id.* at 7-8, 10.)

The Objectors respond that BNE made no attempt to address the special exception criteria related to the proposed use "at this particular location" or the negative impacts resulting from "the characteristics of the neighboring lands." (Objectors' Br. at 10, 15.) The Objectors argue that BNE failed to rebut the testimony of Terry, their traffic engineer, or local residents/owners, all of which established that the nearby dangerous intersection and limited access to the proposed

development would disproportionately burden traffic more than one would ordinarily expect for the same proposed use. (*Id.* at 10.)

## III. DISCUSSION

### A. General Legal Principles

"Generally speaking, '[a] special exception is not an exception to a zoning ordinance, but rather a use which is expressly permitted, absent a showing of a detrimental effect on the community.'" *Tower Access Grp., LLC v. S. Union Twp. Zoning Hearing Bd.*, 192 A.3d 291, 300 (Pa. Cmwlth. 2018) (citation omitted). "In other words . . . '[t]he important characteristic of a special exception is that it is a conditionally permitted use, legislatively allowed if the standards are met.'" *Id.*

This Court has explained that "an applicant for a special exception has **both** the duty of presenting evidence and the burden of persuading the zoning hearing board that the proposed use satisfies the **objective** requirements of the zoning ordinance for the grant of special exception." *Id.* (emphasis added) (citing *Berner v. Montour Twp. Zoning Hearing Bd.*, 176 A.3d 1058, 1069 (Pa. Cmwlth. 2018), *rev'd in part on other grounds*, 217 A.3d 238 (Pa. 2019)). "By showing compliance with the specific criteria, the applicant establishes that the proposal is presumptively consistent with the promotion of the public health, safety and welfare." *Blancett-Maddock v. City of Pittsburgh Zoning Bd. of Adjustment*, 6 A.3d 595, 600 (Pa. Cmwlth. 2010) (citation omitted); *see also Quaker Valley Sch. Dist. v. Leet Twp. Zoning Hearing Bd.*, 309 A.3d 279, 288 (Pa. Cmwlth. 2024). "The burden then normally shifts to the objectors of the application **to present evidence and persuade** the [z]oning [h]earing [b]oard that the proposed use will have a generally detrimental effect on health, safety and welfare or will conflict with the expressions of general

12

policy contained in the ordinance." *Manor Healthcare Corp. v. Lower Moreland Twp. Zoning Hearing Bd.*, 590 A.2d 65, 70 (Pa. Cmwlth. 1991) (emphasis added).

### B. Technical Compliance Versus Compliance in Spirit with Zoning Code

In its first issue, BNE argues it complied with the specific requirements of Section 595-32(A)(3) of the Zoning Code and that the ZHB erred or abused its discretion by denying its Application for its violation of the "spirit" of the Zoning Code. We agree.

Section 595-32(A)(3) of the Zoning Code sets forth specific, objective requirements an applicant seeking a special exception for low-rise apartments must meet:

(a) Minimum lot size: 1,250 square feet per dwelling unit with a minimum lot width of 50 feet and a minimum dwelling unit size of 450 square feet.

(b) Maximum impervious surface: 50% in the INS District or 80% in the DD.

(c) Maximum dwelling units per acre: 20.

(d) Maximum building length: 150 feet.

(e) The primary façade of residential low-rise buildings shall front the street upon which it is constructed. In the case of corner lots, low-rise buildings shall have primary façades on each street the building is situated, except in the case of the corner lot being created by an alley or the building is set back from the side street by more than five feet.

(f) No part of any building shall be nearer than 12 feet to any other building or groups of attached buildings, and no portion of the front or rear of any building or groups of attached buildings shall be nearer than 50 feet to the front and rear of another building or groups of attached buildings.

ZONING CODE § 595-32(A)(3).

13

As set forth in the ZHB's findings of fact, BNE's expert Bahnick testified that the specific requirements set forth in Section 595-32(A)(3) were each satisfied. (R.R. at 8a; 67a-72a; FOF ¶ 8(h).) Neither the Objectors nor any other nonparty neighbor offered a witness to testify to any alternate calculations for the measurements presented by Bahnick to satisfy this Section or presented any evidence with alternate calculations. The ZHB conceded that BNE demonstrated "technical" compliance with all dimensional requirements set forth in subsections (a) through (c) of Section 595-32(A)(3)—the subsections it complains were violated "in spirit"—and raised no express concerns regarding BNE's compliance with subsections (d) through (f) in its conclusions of law. [11] (ZHB Decision at 7.)

With respect to the ZHB's conclusions that BNE's "technical compliance" with the Zoning Code may violate its "spirit" because its calculations under subsections (a) through (c) of Section 595-32(A)(3) fail to reflect that much of the Property is undevelopable, the Zoning Code contains no requirement that an application may use only the developable area versus the total area of the property in calculating density, impervious surface, or other measurements under these subsections. The Zoning Code is likewise silent as to any prohibition on placing all apartment units on a small portion of a property, provided that the objective requirements are met. By stating that BNE has violated the "spirit" of the Zoning Code while admitting that technical compliance with subsections relating to minimum lot size, maximum impervious surface, and maximum dwelling units per

---

[11] The trial court appears to agree that the ZHB made no express finding of noncompliance with the specific requirements for a special exception, noting in its opinion issued pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), Pa.R.A.P. 1925(a), that "the [ZHB] equivocates as to whether [BNE] complied with Section 595-32(A) . . . ." (Trial Ct. Op. 6.)

14

acre may be reasonably found, the ZHB has essentially read language into this Section that is otherwise absent from the Zoning Code.

"When interpreting a zoning ordinance, we apply the rules of statutory construction, with the primary mission of determining legislative intent, which is best indicated by the plain language of the statute." *City of Clairton v. Zoning Hearing Bd. of City of Clairton*, 246 A.3d 890, 909 (Pa. Cmwlth. 2021) (citation omitted). While we are mindful that a zoning hearing board's interpretation of its own ordinance is to be afforded great weight and deference, this deference only extends so long as the interpretation is not "clearly erroneous." *See Bethlehem Manor Village, LLC v. Zoning Hearing Bd. of City of Bethlehem*, 251 A.3d 448, 459 (Pa. Cmwlth. 2021) (citation omitted). If a zoning hearing board's interpretation "is inconsistent with the plain language of the ordinance or the meaning of the ordinance is unambiguous, the 'interpretation carries little or no weight.'" *Sabatini v. Zoning Hearing Bd. of Fayette Cnty.*, 230 A.3d 514, 521 (Pa. Cmwlth. 2020) (quoting *Malt Beverage Distribs. Ass'n v. Pa. Liquor Control Bd.*, 918 A.2d 171, 176 (Pa. Cmwlth. 2007)). This is because "the promulgation of a zoning ordinance is a legislative act." *Ludwig v. Zoning Hearing Bd. of Earl Twp.*, 658 A.2d 836, 838 (Pa. Cmwlth. 1995). "[Z]oning boards and the courts must not impose their concept of what the zoning ordinance should be, but rather their function is only to enforce the zoning ordinance in accordance with the applicable law." *Id.* (quoting *Appeal of Kline*, 148 A.2d 915, 916 (Pa. 1959)).

It is a well-settled principle that "ambiguities in an ordinance must be interpreted in favor of the landowner." *Bethlehem Manor*, 251 A.3d at 466; *see also Caln Nether Co., L.P. v. Bd. of Sup'rs, Thornbury Twp.*, 840 A.2d 484, 491 (Pa. Cmwlth. 2004) ("[O]rdinances are to be construed expansively, affording the

15

landowner the broadest possible use and enjoyment of its land . . . . Undefined terms are given their plain meaning, and any doubt is resolved in favor of the landowner and the least restrictive use of the land."). Here, the "[m]inimum lot size" requirement set forth in Section 595-32(A)(3), which the ZHB appears to suggest should be calculated based on developable area rather than total area, does not contain language detailing this method of calculation in the Zoning Code. ZONING CODE § 595-32(A)(3). Further, although Section 595-12 sets forth lot size measurements, neither "[m]inimum lot size" nor "lot size" are defined under the "Definitions" section of the Zoning Code. Both "lot" and "lot area," however, are defined:

> LOT — A designated parcel, tract or area of land established by plat, subdivision or otherwise and permitted by law to be used, developed or build upon as a unit. For the purpose of this chapter, a "lot" is further identified as:
>
> - The total of all lands described in a legal deed or record; or
>
> - The total of two or more contiguous parcels described in separate legal deeds of record owned by the same person.
>
> LOT AREA — The total horizontal area of the lot lying within the lot lines, excluding any existing or designated future street rights-of-way.

ZONING CODE § 595-04(A)(4). To the extent that the definitions of "lot" and "lot area" both contemplate that an applicant take into account the "total" area of a lot—exclusive of deductions for portions of a property that are undevelopable—reading "minimum lot size" to require an applicant to deduct undevelopable land from a lot's total area when calculating minimum lot size is contrary to these definitions.

16

Similarly, the criterion for "[m]aximum impervious surface" set forth in Section 595-32(A)(3) does not specifically set forth that its calculation must be based on the "developable" area of a property for which a special exception is sought, nor does its definition in the Zoning Code, which provides the following definition: "IMPERVIOUS SURFACE RATIO — A percentage of **total lot area** covered by impervious surfaces." *Id.* (emphasis added). Finally, as to the criterion for "[m]aximum dwelling units per acre" set forth in Section 595-32(A)(3), the plain language of the Zoning Code contains no requirement that this number be calculated as maximum units per "developable" acre, and to adopt such an interpretation would be clearly erroneous. *Id.*

In the absence of any language in the Zoning Code requiring that BNE base its calculations under Section 595-32(A)(3) on developable area and not total area—and in the absence of any testimony or evidence from the Objectors or nonparty neighbors to the contrary—the ZHB committed an error of law by adopting an interpretation of the Zoning Code inconsistent with its plain language. Accordingly, to any extent that the ZHB found that BNE failed to comply with the objective requirements of Section 595-32(A)(3) for reason of violation of the "spirit" of the Zoning Code—and it is unclear from the ZHB's Decision whether it intended to render this conclusion or not—this conclusion was in error.

Further, the ZHB raises for the first time in its Brief that lack of streets in BNE's plans presented at the hearing demonstrates noncompliance with subsection (e), which requires that façades face the street in the proposed development. (ZHB's Br. at 11-12.) Although the ZHB decision makes passing reference to the proposed development lacking "appropriate public roads" or "room to create public streets," it concluded "the proposal complies with [s]ubsection [(]e[)] relative to the fa[ç]ades

17

of the structure . . . ." (ZHB Decision at 7.) We decline to rewrite the ZHB's original conclusions to find noncompliance where none was previously found.

### C. Detrimental Impacts on Public Health, Safety, and General Welfare

In its second issue, BNE asserts that the Objectors failed to meet their initial evidence presentation burden with respect to proving that the proposed use detrimentally impacts public health, safety, and general welfare of the community, thus the ZHB erred by denying the Application.

### i.     Misapplication of the Burden of Initial Evidence Presentation

As set forth above, an applicant has "both the duty of presenting evidence and the burden of persuading the zoning hearing board" that the proposed use meets the specific, objective criteria when applying for special exception of use. *See Tower Access Grp., LLC*, 192 A.3d at 300. In some cases, a zoning ordinance may also appear to alter the parties' respective burdens, containing language that may place a burden on the applicant "as to the matter of detriment to health, safety and general welfare." *Manor*, 590 A.2d at 70 (citations omitted). "Such a provision in the [z]oning [o]rdinance[,] however, **merely places the persuasion burden on the applicant**," while "[t]he **objectors still retain the initial presentation burden** with respect to the general matter of the detriment to health, safety and general welfare." *Id.* (citations omitted) (emphasis added); *see also Quaker Valley Sch. Dist.*, 309 A.3d at 288; *Kern v. Zoning Hearing Bd. of Tredyffrin Twp.*, 449 A.2d 781 (Pa. Cmwlth. 1982) (holding that even where a zoning ordinance contains language that an applicant shall be responsible for presenting evidence, the "evidence presentation duty" or "evidence presentation burden" as applied to general detriment standards cannot be shifted from the objectors to the applicant). This shifting of the burden of persuasion to an applicant rather than the burden of initial evidence presentation with

respect to general requirements is necessary because "it would be manifestly unfair to require [an applicant] to prove conformity with a policy statement, the precise meaning of which is supposed to be reflected in [s]pecific requirements." *Bray v. Zoning Bd. of Adjustment*, 410 A.2d 909, 911 (Pa. Cmwlth. 1980) (citation omitted).

If a special exception criterion "is nonobjective or too vague to afford the applicant knowledge of the means by which to comply, the requirement is either one that is not enforceable . . . or, if it relates to public detriment, **the burden shifts to an objector**, who must demonstrate that the applicant's proposed use would constitute such a detriment," even where the zoning ordinance may contain language appearing to place a burden on applicant. *Williams Holding Grp., LLC v. Bd. of Sup'rs of W. Hanover Twp.*, 101 A.3d 1202, 1213 (Pa. Cmwlth. 2014) (emphasis added). "It is important to appreciate that the burden placed on the objectors is a heavy one." *Marr Dev. Mifflinville, LLC v. Mifflin Twp. Zoning Hearing Bd.*, 166 A.3d 479, 483 (Pa. Cmwlth. 2017). "[Objectors] cannot meet their burden by merely **speculating** as to possible harm, but instead must show **a high degree of probability** that the proposed use will substantially affect the health and safety of the community." *Id.* (citations omitted) (emphasis added).

Upon careful review, we conclude that the ZHB erred by assigning the burden of initial evidence presentation to BNE with respect to the general requirements in Section 595-40(C) of the Zoning Code, relating to detrimental impacts of the proposed use on public health, safety, and general welfare of the community. Here, the additional, general criteria that all applicants must comply with to obtain a special exception are set forth in Section 595-40(C) of the Zoning Code:

> The [ZHB] shall grant a special exception only if it finds adequate evidence presented by the applicant that the proposed special exception is duly authorized under provisions of this chapter, that the application

19

falls within the terms of the specific provisions allowing for special exceptions, and that the proposed use complies with all other requirements of this chapter and the following criteria:

(1) The special exception shall not cause overcrowding of the land beyond what would normally be expected from the proposed use.

(2) The special exception shall not impair the adequate supply of light and air to adjacent properties.

(3) The special exception shall not burden the water, sewer, school, park or other public facilities beyond what would be normally expected from the proposed use.

(4) The proposed use shall not substantially change the character of any surrounding residential neighborhood, after considering any proposed conditions upon approval such as limits upon hours of operation.

(5) The proposed use will promote preservation or adaptive reuse of the sites and structures identified by the Local Historic District regulations.

(6) The special exception shall not cause congestion in public streets or transportation systems beyond what would normally be expected from the proposed use.

(7) The special exception shall not create a significant hazard to the public health and safety, such as fire, toxic or explosive hazards.

(8) The proposed use shall be suitable for the site, considering the disturbance of steep slopes, mature woodland, wetlands, floodplains, springs and other important natural features.

(9) The proposed use, located on the particular property at issue, having all of the characteristics as proposed, and considering the present characteristics of neighboring lands will not cause negative impacts over and above those typically associated with such uses located and operated in a usual manner.

ZONING CODE § 595-40(C).

The ZHB does not dispute that the above criteria set forth in Section 595-40(C) are nonobjective or "general," having characterized these requirements as "general" in its conclusions of law. ((ZHB Decision at 6.) We agree that these criteria are general and nonobjective, as each subsection is indefinite, broad, and pertains in some way to the public health, safety, and general welfare of the community. Thus, while the Zoning Code contains language that purports to shift the burden of presenting evidence to BNE, only the burden of persuasion—not the burden of initial evidence presentation—shifts to BNE. *See, e.g.*, *Williams*, 101 A.3d at 1213; *Manor Healthcare Corp.*, 590 A.2d at 70.

Despite the burden of initial evidence presentation remaining with Objectors and the nonparty neighbors as to each of the general criteria in Section 595-40(C), the ZHB repeatedly misconstrues the parties' burdens in its Decision. Specifically, the ZHB misapplies the burden of initial evidence presentation by improperly highlighting alleged deficiencies in BNE's production to conclude BNE failed to comply with Section 595-40(C), instead of examining the sufficiency of the evidence produced by the Objectors and nonparty neighbors for each subsection. For example, with respect to the general criterion for negative impacts caused by the proposed use, the ZHB improperly places the burden of initial evidence presentation on BNE when it concludes that BNE "failed to present sufficient testimony or evidence" necessary "to establish" compliance by "rejecting the opportunity to present additional evidence and/or testimony, at least with respect to traffic." (ZHB Decision at 8); *see also* ZONING CODE § 595-40(C)(9). The ZHB's conclusions related to the overcrowding criterion bear the same misapplication of this burden. (*See* ZHB Decision at 7); *see also* ZONING CODE § 595-40(C)(1). By disregarding that the burden of initial evidence presentation for the general criteria under Section

21

595-40(C) fell on the Objectors and the nonparty neighbors and instead focusing on BNE's purported burden of initial evidence presentation, the ZHB committed an error of law.[12] With these burdens in mind, we examine each of the four general criteria that the ZHB claims BNE did not meet and conclude that the ZHB erred by concluding that the Objectors and nonparty neighbors met their heavy burden of proving to a high degree of probability that the proposed use will substantially affect the health, safety, and welfare of the community.

### ii. Overcrowding of the Land Beyond What Would Normally Be Expected from the Proposed Use

First, the ZHB concludes that granting the special exception would cause overcrowding of the land beyond what would normally be expected, in violation of subsection (1) of Section 595-40(C). (ZHB Decision at 7.) In support of this conclusion, the ZHB cites to concerns that the proposed development would be "compacted onto the small portion of the land that is developable, but without appropriate public roads" to "alleviate . . . significant difficulties on the local roadways[.]" (*Id.* at 7.) The ZHB also cites to concerns regarding traffic "during the morning hours when school buses are running and everyone is leaving for work at approximately the same time[.]" (*Id.* at 7.) On review, we find that the ZHB committed legal error when it concluded that the evidence was sufficient to support finding that the BNE violated the criterion for overcrowding.

As a threshold matter, the ZHB found technical compliance with the Zoning Code's objective requirements; thus, the ZHB has no basis to deny the Application for crowdedness of a development that is otherwise code-compliant as to building

---

[12] While we would consider remand for the ZHB to consider the evidence with the appropriate burdens on each party in some cases, we will not do so in this case where the evidence of the Objectors and nonparty neighbors is insufficient to meet their heavy burden as a matter of law and where judicial economy would favor us addressing the matter at this time.

distance, density, and so on. As to the ZHB's conclusory statements related to morning rush hour traffic and the proposed development's ability to accommodate school bus traffic, the only evidence regarding morning traffic came from Bellafatto[13] and the Chestnut Ridge residents, who expressed general complaints regarding existing morning traffic on surrounding roads and speculation that the proposed use will increase this traffic by an unspecified amount, at unspecified hours. (R.R. at 143a-45a, 170a-71a, 175a.) The ZHB's concern that school buses will somehow make the proposed development overcrowded beyond what would normally be expected also finds no support beyond mere speculation. The only testimony raising school buses as a traffic concern came from Bellafatto, who stated that a bus stop currently exists at the intersection and declared, without any factual basis for his assertion, that more school buses are sure to follow:

> I want to point out that Morrison [Avenue] and George [Street] is also a school bus stop.
>
> . . . .
>
> So as far as the traffic [], there's going to be more school buses. How's that going to affect the intersection?

(*Id.* at 150a, 171a.) When asked where the proposed development's school bus stop would be located and whether school buses will be able to enter the proposed development given the width of applicable drives, Bahnick testified that "we haven't discussed access to this site with the school district at this point . . . ." (*Id.* at 94a.) That the above exchanges represent the totality of the evidence on school bus traffic

---

[13] As set forth more fully above, it is unclear whether Bellafatto may be considered a witness who offered sworn testimony at the hearing before the ZHB. For sake of completeness, we will consider Bellafatto's statements on the merits even if not determined to be "testimony" given under oath.

demonstrates that the ZHB committed an error of law by relying on **generalized** fears of increased traffic to find "overcrowding of the land beyond what would normally be expected" with only speculative evidence in the record. (ZHB Decision at 7.) While it may be tempting for the ZHB to simply find, as it does here, that overcrowding is "the logical conclusion" from the construction of 256 additional units, mere increased traffic is not grounds to deny a special exception where the Zoning Code specifically contemplates this type of use and assumes that some level of overcrowding and increased traffic is expected. *See Accelerated Enters., Inc. v. Hazle Twp. Zoning Hearing Bd.*, 773 A.2d 824, 827 (Pa. Cmwlth. 2001). Given the lack of legally sufficient evidence to support Objectors' concerns related to the interplay of rush hour traffic and school bus logistics, it was legal error for the ZHB to base its overcrowding conclusion on pure speculation.[14] (ZHB Decision at 7.)

### iii. *Substantial Change to Character of Surrounding Residential Neighborhood*

Second, the ZHB determined that the proposed development would "change" the character of the surrounding residential neighborhood in violation of subsection (4) of Section 595-40(C), to the extent that it is situated in the "Block Class A" within which "much lighter density development is envisioned and intended[.]" (ZHB Decision at 8.) Contrary to the ZHB's determination, the proposed development is consistent with the Zoning Code.

---

[14] We note that concerns regarding traffic impact of the proposed development may be further evaluated and addressed in the land development stage. *See, e.g.*, *In re Thompson*, 896 A.2d 659, 670 (Pa. Cmwlth. 2006) ("Special exception or conditional use proceedings involve only the proposed use of the land, and do not involve the particular details of the design of the proposed development."); *In re Brickstone Realty Corp.*, 789 A.2d 333, 343 (Pa. Cmwlth. 2001) (citations omitted) ("We have held that zoning regulates the use of land, not the particulars of its development and construction.").

24

Section 595-12(A) of the Zoning Code states that the legislative intent or purpose for the College Hill District in which the Property is located:

> The purpose of the College Hill District is to protect the character of this unique hillside neighborhood adjoining Lafayette College, accommodating **a mix of housing types and development intensities**, neighborhood retail and commercial services, green space, and appropriate infill.

ZONING CODE § 595-12(A) (emphasis added). Further, the contemplated use, "A8 Residential low-rise," is specifically enumerated in Section 595-12 as a special exception use for the College Hill District. *Id.* § 595-12(C). Moreover, the evidence established, as found by the ZHB, that the surrounding area already hosts apartments to the south of the Property and a "similar" development to the north of the Property, which the ZHB estimated to total approximately 300 or more apartment units. (ZHB Decision at 8.) Where the Zoning Code specifically states that the College Hill District should accommodate a variety "of housing types and development intensities," the proposed use is expressly contemplated by the Zoning Code, and the ZHB found other complexes totaling hundreds of units already exist in the surrounding area, the record does not contain substantial evidence to support finding that the proposed development would **substantially** change the character of the surrounding residential neighborhood.

Indeed, the ZHB's Decision comports with this conclusion. Although the ZHB states that BNE did not establish compliance with the requirement concerning alteration to the surrounding residential neighborhood, the ZHB's Decision finds only that the proposed use "would **change** the character of the surrounding residential neighborhood." (ZHB Decision at 8.) The ZHB did not find that the proposed use would "**substantially change**" the character of the surrounding

25

residential neighborhood as required by subsection (4) of Section 595-40(C). ZONING CODE § 595-40(C)(4) (emphasis added). Obviously, an increase in the number of apartment complexes in a residential area may change the character of a surrounding residential neighborhood to some degree, but the standard is not that any "change" can bar the proposed use.

### iv. *Congestion in Public Streets or Transportation Systems Beyond What Would Normally Be Expected from Proposed Use*

Third, the ZHB concluded that the special exception would cause congestion beyond what would normally be expected from the proposed use, in violation of subsection (6) of Section 595-40(C). The ZHB based this conclusion on its finding that traffic from the proposed 256 new units would access the same street (George Street) as several other apartments and "similar" developments—resulting in potentially over 500-550 units accessing George Street all within a one-third of a mile distance, on the same side of the street. (ZHB Decision at 8.) The ZHB committed an error of law by drawing this conclusion, as the evidence presented was insufficient to satisfy the high standard applicable when refusing to grant a special exception in cases where traffic congestion is alleged to threaten the public health, safety, and general welfare of the community.

It is well established that "not every anticipated increase in traffic will justify the refusal (to grant) a special exception." *Bray*, 410 A.2d at 914 (quotation omitted). A mere increase in traffic is not "grounds for denial of a special exception unless **there is a high probability [(1)] that the proposed use will generate traffic not normally generated by that type of use and [(2)] that the abnormal traffic threatens safety**." *Accelerated Enters.*, 773 A.2d at 827 (emphasis added). A "likelihood" that the proposed use will generate traffic not normally generated by

26

that type of use and that the abnormal traffic threatens safety is not enough to satisfy the "high probability" standard. *See Appeal of O'Hara*, 131 A.2d 587, 596 (Pa. 1957). "Objectors must demonstrate more than unsubstantiated concerns or vague generalities, and **mere speculation** as to possible harm is insufficient." *Siya Real Est. LLC v. Allentown City Zoning Hearing Bd.*, 210 A.3d 1152, 1160 (Pa. Cmwlth. 2019) (emphasis added) (quotation and alteration omitted).

"Proof of abnormal and hazardous traffic effects would usually require evidence in the form of **traffic counts, accident records, and expert evidence**." *Brickstone*, 789 A.2d at 342 (emphasis added) (citing *Bailey v. Upper Southampton Township*, 690 A.2d 1324 (Pa. Cmwlth. 1997)). "[M]ere lay testimony of concerns regarding increased traffic . . . is insufficient to support the denial of a special exception." *Siya*, 210 A.3d at 1161 (alterations in original) (quoting *Dunbar v. Zoning Hearing Bd. of City of Bethlehem*, 144 A.3d 219, 226 (Pa. Cmwlth. 2016)). This Court has found that even where nine neighbors testify to the possibility of traffic problems arising from increased traffic generated by the proposed use at a location where traffic problems already exist, such testimony does not rise to the level of "high probability [(1)] that the proposed use will generate traffic patterns not normally generated by this type of use and [(2)] that this abnormal traffic will pose a substantial threat to the health and safety of the community" necessary to justify refusal of an otherwise valid land use. *See Manor Healthcare*, 590 A.2d at 71.

Here, the record contains no evidence beyond pure speculation as to whether the proposed use will cause congestion **beyond what would normally be expected for the use**, or whether the proximity of the Lafayette apartments to the south of the Property and a "similar" development to the north would contribute to traffic

27

generated from the proposed use to cause such congestion. Objectors' traffic expert Terry offered no testimony to support this conclusion regarding congestion exacerbated by the nearby apartments, nor to support any finding of high probability that the proposed use will generate traffic not normally generated by that type of use and that the abnormal traffic threatens safety. Terry testified as to "concerns that [BNE will] have adequate capacity" based on the site plan, but declined to elaborate on these concerns and admitted to having limited ability to assess congestion in the surrounding area at all, given that the three-way stop at the intersection and the limited sight distance "really makes it very difficult to evaluate the capacity and the performance of the intersection." (R.R. at 160a-61a.) Terry agreed, in fact, that the number of trips estimated by BNE's expert, Wichner, for a 256-unit low-rise apartment dwelling was accurate. (*Id.* at 162a.) He testified that he could draw no conclusion regarding whether the proposed use would or would not cause congestion from the estimated trip data, and that he did not actually confirm any traffic counts to measure anticipated congestion. (*Id.* at 163a-64a.) When asked whether he agrees that "the number of trips would have a greater impact at this particular location, than it would say at a location that had multiple accesses and egresses from different directions," Terry simply responded "yes" with no elaboration. (*Id.* at 162a.) Moreover, while the ZHB appears to have accepted the testimony of Terry over Bahnick and Wichner, the ZHB Decision contains few to no credibility determinations concerning these expert witnesses. The ZHB Decision also contains no finding or conclusion expressly finding a high probability that the proposed use will generate traffic not normally generated by that type of use and that the abnormal traffic threatens safety.

28

With respect to safety, Terry testified, in general, that the intersection does not have adequate sight distance, that the three-way stop is "a problem when the weather is bad," and that "access to the sight is a big concern," but did not tie these concerns to the proposed use at any length. (*Id.* at 159a.) Moreover, the ZHB noted that Terry testified that some measures could be implemented to improve safety at the intersection of Morrison Avenue and George Street. (FOF ¶ 16.) Thus, while Terry offered insight into the already existing and dangerous intersection, his generalized testimony did not support finding to a high degree of probability that the traffic to be generated is abnormal for the type of use or that abnormal traffic threatens safety, nor did the ZHB make such a finding related to Terry's testimony in its Decision.

The lay testimony of Objectors and the nonparty neighbors is similarly insufficient to meet the high probability standard set forth in the case law.[15] Here, witnesses for the Objectors and the nonparty neighbors testified to, *inter alia*, their personal experiences with traffic near the proposed development, the dangerousness of the intersection, past accidents and risk of future accidents at the intersection, difficulty pulling out of driveways located near the development, and their fears concerning the anticipated traffic impact the 256-unit complex funneling traffic from two close-by ingress and egress points if the Application is granted. (R.R. at 145a-47a, 149a-50a, 170a-71a, 175a.) While the Court appreciates the seriousness of these concerns and their effect on residents, owners, travelers, and passersby alike, none of this lay testimony establishes to a high degree of probability that the

---

[15] Once again, we considered the "testimony" of Bellafatto on the merits, notwithstanding that this Court is not certain whether he was sworn in as a witness before providing a statement to the ZHB. Even accepting this testimony, we do not find it sufficient to have met the high probability standard set forth above.

29

proposed use would generate traffic not normally generated by that type of use or that the abnormal traffic threatens safety. *Marr Dev. Mifflinville, LLC*, 166 A.3d at 484. The record contains no traffic counts, traffic studies, specific information regarding the amount of traffic expected to flow from the proposed use or from surrounding apartments, traffic data as to congestion at specific times of day, percentages of anticipated traffic increases, or any other evidence that might allow the ZHB to evaluate or quantify whether the anticipated traffic is abnormal for the type of proposed use, and, if abnormal, whether it threatens safety with a high degree of probability. In sum, neither a mere increase in traffic nor the existence of other apartment complexes in near proximity to the proposed development is evidence of abnormal traffic or a threat to safety with a high degree of probability, without more. *Accelerated Enters.*, 773 A.2d at 827. The Objectors and the nonparty neighbors therefore did not meet their heavy burden of proving to a high degree of probability that the proposed use will substantially affect the health, safety, and welfare of the community, and the ZHB committed an error of law in finding the Objectors' speculative evidence sufficient to have met this high standard. *See, e.g.*, *Siya*, 210 A.3d at 1160; *Marr Dev. Mifflinville, LLC*, 166 A.3d at 484.

>    ***v.*** ***Negative Impacts of Proposed Use on the Particular Property, Having All of the Characteristics as Proposed, and Considering the Present Characteristics of Neighboring Lands***

Fourth, the ZHB concluded that BNE "failed to establish their entitlement" to the requested special exception under subsection (9) of Section 595-40(C), the criterion for negative impacts from the proposed use, "at least with respect to traffic," because:

> [BNE] failed to present sufficient testimony or evidence to establish that the proposed use, **located on the particular property, having all of the characteristics as proposed, and considering the**

**characteristics of neighboring lands**, will not cause negative impacts over and above those typically associated with such uses and operated in a usual manner, as noted above [].

(ZHB Decision at 9 (emphasis in original).)   The arguments advanced by the Objectors, the City, and the ZHB as to this criterion for negative impacts generally urge this Court to hold that the unique characteristics of the Property and neighboring lands—including the steep topography, the dangerous intersection blind on three sides, the limited ingress and egress to and from the 256-unit complex, the short distance between these ingress/egress points, and the denseness of the development compared to surrounding lands—all provide context to find negative impacts beyond those normally generated and that this situation involves more than just a potential increase in traffic.   While we appreciate the characteristics of the Property and of the neighboring lands, these arguments essentially ask this Court to bar BNE from relief because the proposed development would cause additional traffic to enter an existing, already dangerous traffic situation.   To deny a special exception application on these grounds would constitute error.

This Court has held that it is error for a zoning hearing board to deny a conditional use application simply because "the proposed use would severely exacerbate an **already dangerous traffic condition** . . . which is primarily generated by other sources." *In re Cutler Grp., Inc.*, 880 A.2d 39, 43 (2005) (emphasis added). This case presents very similar facts to those in *Cutler Group*.  In *Cutler Group*, the zoning hearing board concluded that the construction of a proposed development would increase traffic. *Id.*  Specifically, traffic was estimated to increase over a one-lane bridge by 80%, adding over 252 trips to the 315 trips already taking place on a daily basis. *Id.*  The proposed development was located in the proximity of an existing, dangerous traffic condition not unlike the dangerous intersection in this

31

case: a ninety-degree turn on the approach to a one-lane bridge from the proposed development. *Id.* Because the zoning hearing board found that the sharp approach from the development to the bridge was a dangerous condition already existing independent of the proposed use—"caused primarily by the ninety-degree approach to the one-lane bridge" and "primarily generated by other sources"—this Court concluded it was error for the zoning hearing board to deny the conditional use application for reason of the proposed use's "effect on traffic at the bridge." *Id.* Here, to the extent that the existing, already dangerous condition of the intersection is primarily caused by the steep topography and resulting low visibility, it would similarly be error to deny the Application for the proposed use's impact on traffic at the already dangerous intersection.

### vi. Credibility

Finally, we address the credibility arguments that comprise a significant portion of the ZHB's Brief. The Court acknowledges that the ZHB, as fact finder, "is the ultimate judge of credibility and resolves all conflicts of evidence." *Brickstone*, 789 A.2d at 339. However, as set forth above, after the ZHB found that BNE satisfied all "technical" requirements of Section 595-32(A)(3), the burden shifted to the Objectors and nonparty neighbors to prove to a high degree of probability that the proposed use had a detrimental impact on the health, safety, and general welfare of the community. Regardless of the ZHB's credibility determinations concerning the experts and other witnesses in this case—most of which it raises for the first time now in appellate briefing, having made few to no express credibility determinations in its decision—the Objectors retained the burden of initial evidence presentation on issues related to detrimental effects on the general health, safety, and welfare of the community. As set forth more fully above, neither

the Objectors nor any nonparty neighbors at the hearing met their heavy burden in this regard, and the ZHB erred by holding otherwise—independent of any credibility concerns as to BNE's experts.

## IV. CONCLUSION

For the foregoing reasons, we conclude the ZHB committed legal error when it denied the Application. Accordingly, we reverse the trial court's Order affirming the ZHB's decision.

_____
RENÉE COHN JUBELIRER, President Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

BNE Real Estate Group                          :
                              Appellant         :
                                                :
           v.                                   :      No. 443 C.D. 2025
                                                :
City of Easton Zoning Hearing Board,            :
City of Easton, Alphonse Bellafatto,            :
Ann Bellafatto, Ralph Bellafatto, Lois          :
Bellafatto, Ruediger Gebhardt, Paula            :
Gebhardt, Carol Devlin, Charles Dzuba,          :
Carla Garfield, Allen Jones, Michael            :
Nees, Caroline Lee, Vincent Gangemi,            :
Regina Gangemi, Brett Weber, Van                :
French, and Michael Gable                       :


# **O R D E R**


**NOW**, July 13, 2026, the February 28, 2025 Order of the Court of Common Pleas of Northampton County is hereby **REVERSED**.


_____
RENÉE COHN JUBELIRER, President Judge